RECEIVED
IN LAKE CHARLES, LA
OCT 27 2006
PAM
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **BROOKSHIRE BROTHERS HOLDING, INC., ET AL** | : | **DOCKET NO. 04-1150** |
| VS. | : | JUDGE TRIMBLE |
| TOTAL CONTAINMENT, INC., ET AL | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

Before the Court is "Underwriters Laboratories, Inc.,'s Motion for Summary Judgment Dismissing Plaintiffs' Negligence Claim" (doc. #455") and "Underwriters Laboratories Inc.'s Motion for Summary Judgment Dismissing Plaintiffs' Negligence Claims for (1) Failure to Prove Proximate Causation as to Underwriters Laboratories, Inc. and (2) Failure to Provide Sufficient Evidence of a "Defect" as to Non "Blowout" Flexible Pipes" (doc. #456). In the first motion, Underwriters Laboratories, Inc. ("UL") moves to have Brookshire Brothers' claims of negligence dismissed because Plaintiffs cannot prove the requisite duties, causation and elements of their claim. In the second motion, UL moves the Court to dismiss Plaintiffs' negligence claims because they have failed to prove causation. UL also moves the Court to dismiss certain claims that relate to "non-blowout" flexpipe because Plaintiffs failed to present expert testimony of a "defect" except as to 88 flexible pipes that have "blowouts" and have leaked.

## FACTUAL STATEMENT

The facts of this cases were stated in Memorandum Ruling dated July 7, 2006 (doc. #481) and will not be restated herein.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[2] A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[3] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[4] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[5] The burden requires more than mere allegations or denials of the adverse party's pleadings. The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[6] There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[7]

---

[1] Fed. R.Civ. P. 56(c).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[3] *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999).

[4] *Vera v. Tue*, 73 F.3d 604, 607 (5th Cir. 1996).

[5] *Anderson*, 477 U.S. at 249.

[6] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[7] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[8]

## LAW AND ANALYSIS

UL is an independent, not-for-profit company that develops minimum product safety requirements and tests products for compliance with them.[9] UL does not design, manufacture, distribute, sell, recondition, or refurbish any products or component parts of flexpipe.[10] Manufacturers submit representative samples of their products to UL who evaluates them according to UL's requirements.[11] If UL finds that the submitted product samples comply with UL's requirements, the manufacturer may use and place the UL "Mark" on those products it has produced that it determines comply with UL's requirements. Such products are considered UL "listed." The manufacturer's use of the UL Mark constitutes the manufacturer's certification that its product meets UL's requirements.[12] UL and Total Containment, Inc.("TCI") had a written agreement which set forth the terms and conditions governing UL's listing service concerning TCI's products.[13]

*Dismissal of Negligence claims*

In Count IV of their Fifth Supplemental and Amended Complaint, Brookshire Brothers alleges that UL was negligent in formulating and creating Standard 971, the standard UL used to test

---

[8] *Anderson,* 477 U.S. at 249-50.

[9] UL's exhibit 6, depo. Kenneth Boyce, pp. 10-11; exhibit 7, Depo. Dan Ryan, pp. 17-18, 51-54; exhibit 8, Depo. Tim Crews, p. 11; exhibit 9, Depo. Tom Skowera, pp. 17-18.

[10] UL's exhibit 7, pp. 51-54.

[11] UL's exhibit 6, p. 11.

[12] UL's exhibit 6, pp. 10-13; exhibit 7, pp. 53-54.

[13] UL's exhibit 10; exhibit 11.

3

the flexpipe at issue in this litigation. Brookshire Brothers also alleges that UL negligently performed tests with regard to the flexpipe. Brookshire Brothers argues that UL was negligent in failing to require flexpipe to undergo cyclic testing and immersion testing pointing out that Standard 971 was previously meant for fiberglass pipe, not flexpipe. Finally, Brookshire Brothers alleges that the tests that UL performed were below engineering standards of care as set by the American Society of Testing and Materials (ASTM) and American Petroleum Institute (API).

Brookshire Brothers maintains that had a proper UL Standard 971 been in place as it should have been, and proper testing done, the flaws in flexpipe would have been known early in the 1990s. Brookshire Brothers states that this can be proven by the collapse of the flexpipe industry once UL finally amended and revised the standard in 2004.[14]

For the reasons state in our Memorandum Ruling dated July 7, 2006, this Court finds that Texas law should be applied to those injuries that occurred in Texas, and Louisiana law should be applied to those injuries that occurred in Louisiana.[15]

UL maintains that under both Texas and Louisiana law, UL owed no duty to Brookshire Brothers and is not liable for the alleged defects in the Enviroflex systems installed at Brookshire Brothers' gas stations. UL argues that there is no authority for the proposition that an independent testing laboratory, which did not design or manufacture a product, owes a duty that the product will never fail. UL further argues that there is no legal or factual basis upon which it owes Brookshire

---

[14] Plaintiffs' exhibit 5, Carroll Depo., pp. 10, 11, 35.

[15] Brookshire Brothers argues that Illinois law should apply to its negligence claims against UL utilizing Louisiana Civil Code article 3543 – Issues of conduct and safety. This Court has previously held and continues to hold that the general article, 3542 for delictual and quasi-delictual obligations apply.

4

Brothers any duty merely because UL formulated a standard and tested samples of the product for compliance with it.

Under Texas law, a negligence claim consists of three essential elements: "(1) a legal duty owed by one person to another; (2) a breach of the duty; and (3) damages proximately resulting from the breach."[16] To establish liability, the plaintiff must show both that the defendant owed the particular plaintiff a duty and that the defendant breached it.[17] Under Louisiana's duty-risk analysis for determining liability in tort under Louisiana Civil Code article 2315, the plaintiff must prove that (1) the defendant owed a duty to the particular plaintiff, (2) the defendant breached the duty, (3) the breach was a cause-in-fact of the plaintiff's injuries, and (4) the breach was the legal cause of the plaintiff's injuries – that is, the risk and harm caused were within the scope of the protection afforded by the duty.[18] The threshold question whether a duty exists "is a question of law."[19]

In determining if a duty exists, "the court will consider several interrelated factors including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant."[20] Under both Texas and Louisiana law, the courts inquire into policy considerations to determine if a risk is foreseeable or if a particular risk falls within the scope of the

---

[16] *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608 (Tex. 1996).

[17] *Greater Houston Transportation Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

[18] *Mathieu v. Imperial Toy Corp.*, 646 So.2d 318, 321-22 (La. 1994).

[19] *Firestone*, 927 S.W.2d at 613.

[20] *Greater Houston*, 801 S.W.2d at 525.

duty allegedly owed to the plaintiff.[21]

UL argues that this Court must consider weighing strongly against imposing a duty on it because (1) UL is a not-for-profit organization that voluntarily develops safety standard, (2) UL is not paid for development of its standards, (3) UL performs a valuable service for the good of society, and (4) imposing a duty on UL would subject it to a tremendous burden of litigation and would defeat the social utility of the valuable service that it performs.

UL cites several cases for its position that merely testing products for minimum safety requirements does not impose a duty upon UL.[22] The Court has reviewed these cases but does not find that they support UL's position.

Brookshire Brothers argues and cites cases under Texas, Illinois, and Louisiana law that UL owes a duty to third persons injured by a product "UL listed" if the plaintiff can prove UL's testing was negligent.[23] Because there is scant law in both Texas and Louisiana, the Court will consider Illinois and Delaware law for persuasive authority to determine if UL owes a duty to third parties.

In *Hempstead, supra,* the Delaware court held that '[t]he alleged failure of Underwriters to exercise reasonable care in approving the design of the extinguisher has obviously increased the risk

---

[21] See *Cormier v. T.H.E Ins. Co.,* 745 So.2d 1, 7 (La. 1999); *Greater Houston, supra.*

[22] *Aflex Corp. v. Underwriters Laboratories, Inc.,* 1989 U.S. dist. LEXIS 6935, at *12-13 (C.D. Cal. Mar 21, 1989); *Ultramares Corp. v. Touche, Niven & Co.,* 174 N.E. 441, 444 (N.Y. 1931); *Blackmon v. American Home Products Corp.,* 346 F.Supp.2d 907, 919 (S.D. Tex. 2004).

[23] See *Yassin v. Certified Grocers of Illinois, Inc.,* 150 Ill App.3d 1052, (1st Dist App. 1986); *Pippin v. Chicago Housing Authority,* 78 Ill.2d 204 (Ill. 1979); *Hempstead v. General Fire Extinguisher Corp.,* 269 F.Supp. 109 (D.C. Del. 1967); *Factory Mut. Ins. Co. v. Bobst Group, Inc.,* 319 F.Supp. 880 (N.D. Ill. 2004); *C&I Ins. v. Grinnel Corp., et al,* 2000 WL 6301 [E.D. La. 2000]; *Peacock's Ins. v. Shreveport Alarm Co.,* 510 So.2d 387 (La.App. 2 Cir. 1987).

of harm to plaintiff over that which would have existed if reasonable care had been exercised."[24] In analyzing the defendant's duty under the Restatement Second, Torts § 324A, and denying the defendant's renewed motion for summary judgment, the court held that if plaintiff succeeded in proving his charge that Underwriters Laboratories was negligent in approving the design of a fire extinguisher which was imminently dangerous, and that plaintiff's injury was a result thereof, Underwriters must respond in damages.[25]

In *Pippin v. The Chicago Housing Authority, et al*,[26] the court held that 'liability can arise from the negligent performance of a voluntary undertaking." In *Yassin v. Certified Grocers of Illinois, Inc.*,[27] in a jury trial against UL, as an independent testing laboratory, the court assumed, without deciding, that such suits against independent testing laboratories can be brought in Illinois.[28] In *Factory Mutual Ins. Co. v. Bobst Group*,[29] the court held that a testing and certification agency had a duty to manufacturers to exercise reasonable care in its inspections citing the Restatement (Second) of Torts § 324A. The court also held that contractual limits of liability are not effective to foreclose a duty to third parties, such as Brookshire Brothers in this case. Thus, UL's argument that its disclaimer of liability is effective against Brookshire Brothers is without merit.

---

[24] *Hempstead*, 269 F.Supp. at 118.

[25] *Id.* at 118.

[26] 78 Ill.2d 204, 209 (Ill. 1979).

[27] 150 Ill App.2d (1ˢᵗ App. 1986).

[28] The Illinois court cited *Pippin, supra.*

[29] 319 F.Supp. 880 (E.D. Ill (2004).

Closer to home, in *Peacock's, Inc. v. Shreveport Alarm Company, et al*,[30] the court held that negligent performance of conduct intended to protect another against a risk of criminal misconduct, even if gratuitously undertaken, may create liability. In *C&I Ins. Co., v. Grinnell Corp., et al*,[31] the Court held that UL owed no duty to provide installation requirements, but only because plaintiffs failed to raise a genuine issue of material fact that UL undertook a duty to warn of height restrictions in certifying water sprinklers. The Court found that UL's listing did not purport to address the requisite number, spacing, or height of the sprinkler for any given location; nor did it represent that it was safe to use in all installations. Obviously, had the UL listing addressed the height restrictions, UL would have owed a duty.

UL argues that there is no authority for imposing a duty on UL under the circumstances of this case. The cases cited above say otherwise, albeit the majority of which come from states other than Texas and Louisiana. UL, under its agreement with TCI agreed to test samples of the flexpipe to determine if it met its minimum safety requirements. State agencies, such as the Texas Water Commission, the regulatory agency that oversaw the pipe installation, would not allow flexpipe to be used as an underground means of transporting gasoline without either the UL Mark or a letter of guarantee from Leo Jones of PMI that if the pipe failed, PMI would have to remove the pipe at PMI's expense.[32] The purpose of the flexpipe is to transport gasoline safely – without leakage. Thus, one can easily assume that UL's testing protocols should have determined if the flexpipe could transport gasoline over an extended period of time without leakage.

---

[30] 510 So.2d 387 (App. 2d Cir. 1987).

[31] 2000 WL 6301 (E.D. La. 2000).

[32] Plaintiffs' exhibit 2 - Leo Jones Depo. pp. 74-75, 142-143; Exhibit 20.

Brookshire Brothers maintains that it is suing not only for UL's negligence in performing tests, but also in it formulating and creating its UL Standard 971. One claim of negligence asserted by Brookshire Brothers is UL's failure to require the exterior of flexpipe to be exposed to gasoline as part of the test protocol. Second generation flexpipe accounts for a majority of the failures at issue. Brookshire Brothers has presented evidence that the outer layers or jacket of the flexpipe would become longer and extrude out over the hose coupling when exposed to water and gasoline.[33]

Brookshire Brothers then argues that UL would have learned of this potential pipe failure in 1995, when Standard 971 was first promulgated, and kept defective flexpipe off the market, if it had not negligently exempted flexpipe from the immersion test requirement to which other pipe subject to the same standard was subjected. Brookshire Brothers presents the testimony of Jerry J. Leyden, UL's expert:

> Q. (BY MR. JEANSONNE) Mr. Leyden, in your opinion, if UL either knew or should have known in 1995 what is known today, would UL have been negligent in not requiring that both the inside and outside of flexpipe be exposed to the same test fluid in its immersion testing?
>
> A. I think if they knew then what they knew now, they would have had to change the immersion requirement to include inside as well as outside.[34]

Brookshire Brothers's expert, Stephen P. Grigory summarized that the "UL Standard 971 falls short of an adequate standard for any pipe, pipe material or piping application. It is our opinion that if Underwriters Laboratories developed a proper test protocol the defects in the Total

---

[33] Plaintiffs' exhibit 16, Paul depo. dated June 29, 2006, p. 162-163.

[34] Plaintiffs' exhibit 18, Leyden depo. dated June 9, 2006, p. 208.

Containment pipe would have been detected and no certification issued."[35]

This Court cannot conclude that UL had absolutely no duty to perform its tests with reasonable care or create and/or formulate tests on standards of engineering conduct set by ASTM and API. Brookshire Brothers has presented summary judgment evidence to raise a genuine issue of material fact for trial as to whether UL's conduct of not performing the immersion testing was below the ordinary standard of care. Whether or not UL's conduct was reasonable is for a jury to decide.

*Causation*

UL moves to dismiss the negligence claims asserted against it because Brookshire Brothers has failed to prove proximate causation as to UL. UL argues that three of the four experts (Dr. Jack Fellers, Dr. Charles Manning and Mr. Thomas Wentzel) hired by Brookshire Brothers do not mention UL in any of their reports and offer no opinions as to UL. UL then asserts that the fourth expert (Mr. Stephen Grigory) who criticized the UL 971 Standard never tested any TCI flexpipe. Furthermore, UL asserts that Mr. Grigory admitted in his deposition that his criticism of the UL 971 Standard had nothing to do with the failure of the flexpipe.

Brookshire Brothers directs the Court to its allegation that UL was negligent in failing to conduct "immersion testing." Brookshire Brothers makes the following argument in its opposition brief: "The 971 Standard, which governs UL's award of listing marks on Flexpipe, was developed from other standards which applied to others types of pipe. In its original form, this standard required that both the inside and outside of the pipe which was subject to the test be exposed to hydrocarbons. Tom Skowera, who was in charge of this standard between 1990 and 1997, waived

---

[35] Plaintiffs exhibit 8, p. 1.

the requirement that the outside of Flexpipe be so exposed, and decided to test the pipe solely by filling the inside with gasoline. . . ."[36]

Second generation flexpipe accounts for a majority of the failures at issue in this case.[37] UL did not perform immersion testing on second generation flexpipe. Shell experts Donald R. Paul, Ph.D., a chemical engineer, testified that when exposed to water and gasoline in its reasonably anticipated use, the outer sheath of the flexpipe which is made from polyether polyurethane failed by becoming longer and actually "extruded out over the hose coupling."[38] This led to bending of the hose in sumps,[39] and caused couplings to become "caught."[40]

Brookshire Brothers then submits evidence that in UL's Minutes of the meeting of the Standards Technical Panel for Standard 971 held on December 6, 2003, UL admits: "... the majority of failures [in Primary Flexpipe} are either a direct or secondary result of plastic swelling due to exposure to hydrocarbon fuels." Brookshire Brothers argues that UL would have learned this in 1995, when Standard 971 was first promulgated, and kept defective Flexpipe off the market, if it had not negligently exempted Flexpipe from the immersion test requirement to which other pipe subject to the same standard was subjected. Brookshire Brothers further buttresses their argument with Mr. Skowera's admission that if flexpipe material was not compatible with petroleum products, it would

---

[36] Plaintiffs Exhibit A, Skowera Depo. April 13, 2005, p. 52, pp. 86-92 and 105-107.

[37] Plaintiffs' Exhibit B, Tom Martin Depo. dated Feb. 22, 2006, p. 134.

[38] Plaintiffs Exhibit C, Donald Paul Depo., pp. 162-163.

[39] *Id.* at p. 167.

[40] *Id.*

11

not have been eligible for the UL Mark.[41]

Brookshire Brothers presents UL's expert testimony of Jerry J. Leyden who conceded that if UL knew in 1995 what they know now, "they would have had to change the immersion requirement to include inside as well as outside."[42] UL mechanical engineer, Roland A. Riegel testified in his deposition that exposing a polymer to a hydrocarbon (gasoline) causes a specific breakdown in the material over time.[43] He further testified that this was common knowledge in the 1990s by engineers who worked with polymers.[44]

Circumstantial evidence and reasonable inferences therefrom may form a sufficient basis for a finding of causation. This requires facts sufficient for a jury to reasonably infer that the defendant's acts were a substantial factor in bringing about the injury.[45] UL's assertion that Brookshire Brothers has failed to prove causation is without merit. Brookshire Brothers has created a genuine issue of fact for trial on the issue of causation.

*Non "blowout" flexible pipes*

UL maintains that because Brookshire Brothers failed to produce sufficient proof as to the existence of any "defect" in any flexpipe other than that which experienced a "blowout," any claim

---

[41] Plaintiffs' exhibit A, Skowera depo., p. 64.

[42] Plaintiffs' exhibit E, Leyden Depo., p. 208.

[43] Plaintiffs' exhibit __, Riegel Depo. p.29-36 (One of the materials at issue in the cause of the flexpipe leaks is a polymer).

[44] *Id.*

[45] *Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 237 (5th Cir. 2003); *Randolph v. GM Corp.*, 646 So.2d 10119 (La.App. 1 Cir. 11/10/94); *Hennegan v. Cooper/T.Smith Stevedore Co., Inc.*, (La.App. 4 Cir. 2002)..

12

for damages as to any "non-blowout" pipe must be dismissed. UL argues that because Brookshire Brothers' experts, Dr. Manning and Mr. Wentzel, made a conscious decision to test only samples of TCI flexible pipes which experienced a "blowout", they will not have expert testimony to offer at trial as to flexpipe that does not or has not exhibited visible "blowout" failures. Hence, Brookshire Brothers would not be entitled to damages for any non-blowout flexpipe and such claims must be dismissed.

UL takes issue with an affidavit submitted by Brookshire Brothers in its opposition to this motion, from experts, Dr. Manning and Mr. Wentzel. The new affidavit states in relevant portion:

> The problem of embrittlement is not only contained in the failed flexpipe that was directly observed by us, but more likely than not, is a problem that afflicts the Brookshire flexpipe in general, whether or not the pipe has actually failed. The embrittlement defect in carillon is most likely present in the Brookshire flexpipe in the ground and is most likely a widespread problem.

UL maintains that the declaration in the affidavit contradicts prior testimony of Mr. Wentzel (Dr. Manning and Wentzel co-authored the expert report) that he did not know how his opinion could pertain to any hoses other than the 88 hoses exhibiting "blowout" failures.[46] If at trial the evidence shows that the flexpipe not tested and not theretofore exhibiting defects was made of the same material as the failed flexpipe, the experts could certainly articulate an opinion that the flexpipe still in the ground is more likely than not to fail just as the tested pipe had.

Mr. Wentzel testified that the vast majority of the hoses they inspected were embrittled and that it is most likely Carilon that is the largest contributing factor.[47] The expert report of Manning/Wentzel also states that "[t]he brittleness of the Carilon is most likely the contributing

---

[46] UL's exhibit C, Wentzel depo., pp. 289-290.

[47] Plaintiffs' exhibit R, Wenzel depo., p. 147-150.

factor to the failure of the hoses. The brittle nature of the Carilon will make it susceptible to cracking during the application of any loads/stresses. The brittle nature of the Carilon makes the product defective and unacceptable for use in a fuel transmission hose."[48] In another report by Manning and Wentzel, the experts opine that the crack in Carilon indicate brittle failure which is an indication that loss of mechanical properties are occurring in the Carilon.[49] Shell's expert Donald Paul testified that the effect of exposure to water and gasoline cause the middle layers of second generation flexpipe to degrade and fail which in turn leads to mechanical stresses which resulted in the embrittlement of the Carilon inner liner and its subsequent failure.[50]

Brookshire Brothers argues that all of this expert testimony cites defects which more likely than not affect all flexpipe, whether "blown out" or merely leaking, whether examined by the experts or not, whether failed or still in service. Brookshire Brothers maintains that testimony creates a jury issue in the from of a factual dispute regarding the fitness of flexpipe for its reasonably anticipated use which cannot be resolved through summary judgment.

The Court is cognizant of the fact that the parties in this case were limited as to the number of samples of flexpipe they would be allowed to test. The Court is also aware of the burden it would have been on Brookshire Brothers to dig up non-blowout flexpipe for testing. Also, one could easily reason that in order to find the root cause of an alleged defect, a defective flexpipe would be chosen for testing as a sample of all flexpipe. Even though it will be Brookshire Brother's burden of proof

---

[48] Plaintiffs' exhibit T, Manning/Wentzel Report, dated April 25, 2006, p. 5.

[49] Plaintiffs' exhibit U, Accident Reconstruction Analysis, Inc. Report, dated May 30, 2006, pp. 3-4.

[50] Plaintiffs' exhibit, C, Paul depo,. dated June 29, 2006.

14

at trial to prove that all flexpipe is defective, such an inference can be made by a jury.

## **CONCLUSION**

For the reasons set forth above, the motions for summary judgment filed by Underwriter Laboratories, Inc. will be denied.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 27th day of October, 2006.

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

15