RECEIVED
IN ALEXANDRIA, LA
AUG 30 2007
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| BROOKSHIRE BROTHERS HOLDING, INC., ET AL | CIVIL ACTION NO. 04-1150 |
| VERSUS | JUDGE TRIMBLE |
| TOTAL CONTAINMENT, INC., ET AL | MAGISTRATE JUDGE KIRK |

## MEMORANDUM RULING

Before the court are motions to exclude the proposed expert testimony of Dr. Roberto Benson ("Benson") [R. 1018] and Dr. John Fellers ("Fellers") [R. 1020] ("Ticona motion") filed by defendant Ticona Polymers, Inc. ("Ticona"), as well as a similar <u>Daubert</u> motion concerning Fellers and Benson filed by Cleveland Tubing, Inc. ("Cleveland"), Shell Chemical LP ("Shell"), Dayco Products, L.L.C. ("Dayco"), Mark IV Industries, Ltd. ("Mark IV") and Commerce & Industry Insurance Company ("C & I") [R. 1041] ("Cleveland motion").[1] Travelers Property Casualty Company of Illinois ("Travelers") and Travelers Indemnity Company, formerly Gulf Insurance Company ("Gulf") filed a motion [R. 1030] incorporating and adopting, by reference, all arguments advanced by the parties in all three motions above ("Travelers motion"). In response, plaintiffs Brookshire Brothers Holding, Inc., et al ("Brookshire") filed a memorandum in opposition to the Cleveland and Travelers motions which incorporated requests for sanctions

---

[1] R. 1041 was inadvertently referred to by Brookshire as "R. 1035." Arguments by Brookshire addressed to R. 1035 shall be construed as arguments pertaining to R. 1041.

[R. 1098]. Brookshire also filed a memorandum in opposition to the Ticona motion which incorporated a request for sanctions [R. 1093]. Defendants Dayco and Mark IV filed an individual response [R. 1123] to Brookshire's incorporated request for sanctions.

## I. Background

The facts which gave rise to this suit have been recited many times by this court. For purposes of this ruling, we find it sufficient to recount only those facts which directly concern the issues raised by the motions before us.

Brookshire hired several experts to provide analyses and opinions concerning Carilon and Fortron, two polymers used at different times as an inner lining of the flexpipe which exhibited leaks at Brookshire's retail fueling stations. One of Brookshire's proposed experts, Fellers, authored a report ("Carilon Report")[2] which focused on what role, if any, Carilon and the brass fittings used to couple the flexpipe into the Enviroflex system played in the system failures which form the basis of this suit[3]. He also produced a second report, concerning Fortron ("Fortron Report")[4]. Fellers and Benson gave deposition testimony on the content of the reports in May of 2006. Later that month, Brookshire attached an affidavit by Fellers to its memorandum in opposition to motions for summary judgment by defendant insurers. Fellers gave deposition testimony on the content of this affidavit in August of 2006.[5]

The motions before us concern the reports, deposition testimony and affidavit offered by

---

[2]The Carilon Report is attached as "Exhibit 1" to Cleveland's motion [R. 1041].

[3]Carilon Report at p. 1.

[4]The Fortron Report is attached as "Exhibit 3" to Ticona's motion [R. 1020].

[5]"Exhibit G" to R. 691.

Benson and Fellers. Specifically, defendants allege that various portions of the proposed testimony of each expert are inadmissible under the Federal Rules of Evidence and cases interpreting those rules because such testimony is unreliable or irrelevant. The Ticona motion adds the argument that Benson's testimony should be disregarded due to Benson's failure to produce an expert report and Brookshire's failure to designate him as an expert pursuant to FED. R. CIV. P. 26(A)(2).

Brookshire refutes these arguments, asserting that the testimony offered is admissible and that, further, the Daubert motions filed violate the instructions of this court and are, therefore, sanctionable.

For the reasons expressed herein, the court finds that the several Daubert motions of defendants now considered should be granted in part and denied in part, and, accordingly, the testimony of both Benson and Fellers should be limited in the manner provided for in the court's order issuing this day.

**II.   Applicable Standard**

The admissibility of evidence is governed by the Federal Rules of Evidence. Rule 402 states that all relevant evidence is admissible unless otherwise provided, while all irrelevant evidence is inadmissible. Relevance is defined in Rule 401 as that which has "...any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." While witnesses are not generally permitted to testify in the form of opinion, the federal rules make a distinct exception in the form of expert testimony. Rule 702 governs the admissibility of expert testimony, which may be rendered in the form of opinion

> "...if (1)the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles or methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The United States Supreme Court acknowledged the supremacy of these federal rules in matters concerning evidence, holding that common law might still serve the purpose of interpretive aid, in Daubert v. Merrill Dow Pharmaceuticals, Inc.[6] The Court, speaking unanimously through Justice Blackmun, interpreted the language (as it was then written) of Rule 702 as providing the standard by which all scientific expert testimony must be evaluated.[7] Rule 702, said the Court, required trial courts to act as "gatekeepers" by evaluating both the reliability and relevancy of the proposed expert testimony. Daubert set forth an illustrative list of criteria which might help courts to determine whether or not expert testimony was reliable.[8]

The holding of Daubert was extended to all non-scientific expert testimony in Kumho Tire Co., Ltd. v. Carmichael.[9] In that case, the Court found that an engineer's proposed testimony should be held to the same standard as made applicable to scientific testimony under Daubert because Rule 702 does not differentiate between "scientific knowledge" and "technical" or "other specialized" knowledge.[10] Kumho reiterates the flexible nature of evidentiary analysis

---

[6]509 U.S. 579 (1993).

[7]Daubert, supra, 509 U.S. 579, 587-88.

[8]Id at 593-95.

[9]526 U.S. 137 (1999).

[10]Kumho, supra, 526 U.S. 147-48.

under Rule 702 and the importance of the two main criteria: reliability and relevancy.[11]

### III. Analysis of Law and Argument

Where possible, we will address each issue by the alphabetical letter designation assigned to each argument in the Cleveland motion.

### *Issue B: Fellers' proposed testimony concerning defects in Carilon and Fortron as causes of flexpipe failure*

Carilon is a polymer manufactured by Shell and used, for a period of time, as an inner layer of the multi-layer flexpipe which formed part of the Enviroflex system.

The Cleveland and Travelers motions seek to exclude testimony by Fellers concerning certain "non-homogeneous features" he observed in the Carilon layer. These features are alleged to be "gel particles, cross-linked polymer, black specs, metallic ions and bubbles."[12] Fellers asserts, throughout his testimony, that these features weakened the Carilon layer of the flexpipe and contributed to the leaks at issue in this case. Defendants point out that while Fellers clearly did observe these features, his conclusion that these features contributed to the leaks is wholly unsupported by any of the testing or analysis he performed on the hose samples collected. Defendants argue that this "analytical gap" undermines the reliability and relevancy of Fellers' proposed testimony.

Brookshire's opposition explains that Fellers was hired to "...assess the presence or absence of defects in the Carilon liner..."[13] in this case. Brookshire goes on to say that Fellers

---

[11] Id at 141-42.

[12] Cleveland motion [R. 1041] at p. 8.

[13] Brookshire's memorandum in opposition [R. 1098] at p. 12.

did observe "defects" in the Carilon and that such defects "...render[ed] the Carilon structure of the Flexpipe defective, and unreasonably dangerous in this 'critical application.'"[14]

We have carefully reviewed the testimony offered in Fellers' deposition and must agree with defendants that, while it is clear that non-homogeneous features were observed in the hose samples studied, Fellers failed to undertake testing sufficient to bridge the "analytical gap" between the observation of these features and their role, if any, in the flexpipe failures at issue in this case.[15] In examining Fellers' testimony, it appears that, while he was hired for a rather limited analytical purpose, his report goes well beyond identification of Carilon defects and assigns impact to these features. It appears, additionally, that these conclusions were reached, in large part, by Fellers' exposure to certain Shell documents, which are also at issue in this motion. While we will address Fellers' testimony as to the interpretation of these documents later, we find it necessary to state, now, that we feel his exposure to these documents tainted his testimony in that Fellers reached conclusions which are not supported by his own testing.[16]

Given Fellers' admissions that valid scientific testing is available to prove his causation hypotheses, none of which he performed[17], we cannot allow him to provide causation testimony based on these hypotheses. Fellers' opinions regarding causation overstep the permissible

---

[14]Id.

[15]General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).

[16]See, e.g., Fellers Deposition of 5/22/06, attached as "Exhibit 2" to Cleveland motion, at p. 108.

[17]Id.

extrapolation acceptable by expert witnesses.[18] We find that Fellers should be allowed to testify as to the absence or presence of any "non-homogeneous" features in the Carilon layer, but should be prohibited from offering testimony which states opinions on what role these features played in the flexpipe leaks at issue in this case.

Fortron is another polymer used, at one time, to form one of the innermost layers of flexpipe included in the Enviroflex system. Fortron was manufactured by Ticona and is the subject of an additional report by Fellers.

The Ticona motion alleges that Fellers' opinions regarding Fortron and its role in the flexpipe leaks at issue in this case are inadmissible because, like his proposed testimony concerning Carilon, these opinions fail to satisfy the reliability requirement of FED. R. EVID. 702 and Daubert.

Fellers' Fortron Report states that "Hose E," a sample containing Fortron, contained "surface irregularities," "wall thickness variations," and "black spots."[19] Later in that report, Fellers concludes that "structural defects of cross linked gel particles, black specks, surface irregularities and wall thickness variations would likely be the cause of any failure of TCI flexhose made of Fortron."[20]

It is undisputed that Fellers obtained only three flexpipe samples which contained

---

[18]Moore v. Ashland Chem., Inc., 151 F.3d 269, 279 (5th Cir. 1998); Burleson v. Texas Dept. of Criminal Justice, 393 F.3d 577 (5th Cir. 2004).

[19]Fortron Report at p. 106.

[20]Id at p. 108.

Fortron.[21] These samples were designated as "Hose E, G and H" for purposes of the Fortron Report.[22] Fellers testified that, out of the three Fortron samples, only "Hose E" was actually tested.[23] Fellers' testimony reveals that he observed no cracks or leaks in "Hose E."[24] Fellers also testified that his intention was to select a hose sample which did display a leak during service, but he failed to do so, ending up with three non-leaking samples.[25] When asked why he conducted no comparative testing between new Fortron flexpipe and used Fortron flexpipe, he replied that "...we just simply ran out of time."[26] The cumulative effect of these facts is that Fellers observed no cracked or leaking flexpipe, lined with Fortron, but still reached the conclusion that these features would cause leaks.

We conclude from these facts that Fellers' assertion that "structural defects of cross linked gel particles, black specks, surface irregularities and wall thickness variations would likely be the cause of any failure of TCI flexhose made of Fortron" is a prediction of future events unsupported by any scientific testing. Here, again, lies a vast "analytical gap." As such, testimony by Fellers as to the issue of causation related to Forton is inadmissible under FED. R. EVID. 702 and Daubert, as it is unreliable and does not assist the trier of fact in adjudicating that issue.

---

[21]Fellers Deposition of 5/22/06 at pp. 175 - 177.

[22]Id.

[23]Id at p. 177.

[24]Id at pp. 194 - 197.

[25]Id.

[26]Id at pp. 177 - 178.

8

### *Issue D: Fellers' proposed testimony concerning the impact of SwagLock fittings*

Defendants assert that Fellers' proposed testimony regarding his opinion of the SwagLock hose couplings used to connect the flexpipe with the rest of the Enviroflex system should be deemed inadmissible on the basis that Fellers lacks experience in the area of metal couplings and performed no testing in order to verify his theories concerning the impact of SwagLock fittings on the flexpipe at issue in this case.

Brookshire responds only by arguing that Fellers is a polymer chemist and certainly qualified to give testimony on the characteristics of polymers, which is what he did when he testified concerning the interaction of Carilon with the brass SwagLock fittings used in the Enviroflex system. Further, Brookshire asserts, Fellers need not be an expert on metal couplings to determine how polymer will react with that mechanism.

The Carilon Report states, in part:

> "The design of the Swag seal is clearly flawed...
> This defect causes cracking of the Carilon inner
> liner that leads to gasoline leakage"[27]

While we certainly agree with Brookshire's observation that an expert need not be an expert in metal couplings to talk about the reaction of a polymer to a more sturdy substance, like brass, we find that Fellers' discussion of SwagLock fittings goes well beyond the behavior of Carilon when paired with brass and offers an assessment of the actual design of that fitting, an area in which Brookshire admits Fellers possesses no expertise.

We also find that Fellers' own testimony evidences a lack of knowledge and expertise

---

[27]Carilon Report at p. 26.

as to nature of the couplings at issue.[28] Fellers testified, for instance:

> "Q: I think you've already testified you weren't even aware that this was an expansion-type coupling. You thought it was a compression-type coupling; is that correct?
> A: Yes.
> Q: Big difference, isn't it?
> A: It would be, yes."[29]

Further, Fellers' conclusions with respect to the function of the hose coupling as a cause of gasoline leaks seems to directly contradict the results of the testing he performed:

> "Q: Did you or any of your team...conduct any tests to determine whether or not the hose samples your group chose performed a proper seal?
>
> .  .  .
>
> A: Yes, we did.
>
> .  .  .
>
> Q: And what were the results?
>
> A: I'm thinking that in our testing, we did not see the ones pressurized that the fitting failed. I did attend several of other peoples' tests, and they pressurized – I believe we saw some there that did leak.
>
> Q: ...you did the press your /sic/ ["pressure"] test on the coupling in conjunction with the tube in order to see whether or not the hose coupling made a proper seal with the hose, too, and as I understand it all eight samples, you did not get a leak; is that correct?
>
> A: Well, we didn't pressurize all eight samples. We pressurized several of them, and the ones we pressurized, I don't recall

---

[28] Fellers Deposition of 5/22/06, at pp. 269 - 80.

[29] Id at p. 280.

seeing a leak around the brass fitting.

Q: So, to your knowledge, there was no failure of the seal in regards to the coupling and hose tube; is that correct?

A: Of the ones that we examined in our laboratories, that's correct."[30]

Fellers own tests revealed no leaks whatsoever and his testimony about observing leaks during tests by other people is equivocal at best. Despite this, his conclusion assigns causation to the hose couplings, creating another "analytical gap" which undermines the reliability of his testimony on this issue.

For the reasons cited above, we find that Fellers' proposed testimony concerning the role, if any, of SwagLock fittings in the leaks at issue in this case is inadmissible under Fed. R. Evid. 702 and Daubert.

### Issue E: Fellers' proposed testimony concerning alleged extrusion defects

Defendants assert that Fellers' testimony concerning alleged difficulties experienced by Cleveland during the extrusion process is inadmissible because Fellers does not possess expertise in the area of polymer extrusion and simply relied on documents supplied by counsel for Brookshire to reach his conclusion that Cleveland produced a substandard product. Defendants allege that this proposed testimony is unreliable because, as before, Fellers reaches conclusions which are not supported by any of the testing he performed.

Brookshire refutes this characterization of Fellers' proposed testimony, arguing that Fellers tested the wall thickness of the corrugated pipe and found that the thicknesses were not uniform. Further, says Brookshire, Fellers' conclusions were reinforced by documents of Dayco

---

[30]Id at pp. 281 - 82.

11

and Cleveland which contained admissions that the flexpipe being manufactured was "out of spec."

Having examined Fellers' deposition testimony on this issue, as well as his additional affidavit, the court finds that this proposed testimony lacks reliability due to Fellers' lack of testing to support his conclusions. While we certainly will allow Fellers to testify as to the wall thickness variances he observed, we cannot allow his testimony at trial to convey an opinion regarding whether or not the flexpipe manufactured by Cleveland was "out of spec," as Fellers clearly admits he did not have an understanding of what specifications were actually imposed on the flexpipe:

> "Q: Do you have an understanding as to whether or not – at the time that you prepared this report, whether or not the hose samples were within the specified tolerances?
>
> A: No, I did not. I didn't go back and look for those specification /sic/ – I knew there were specifications, but I didn't go to look for them at the time that I was writing this report."[31]

The Carilon Report expressed the opinion that variations in wall thickness, among other defects, were to blame for the performance of the flexpipe as a fuel carrying device.[32] Yet, we find another gap in the connection between Fellers' own testing and observations and his conclusions.

> "Q: With regard to the variations you noted, were any of the variations the source of a leak or crack as you evaluated the pipe?

---

[31]Id at p. 240.

[32]Carilon Report at p. 25 of 26.

12

A: No."[33]

Again, we find that Fellers' conclusions as to the role of any extrusion difficulties in the leaks at issue in this case are unsupported by the testing he performed. Such testimony lacks reliability as it does not result from scientific testing, but, rather, from Fellers' exposure to documents from other sources. The court will allow Fellers to testify as to any wall thickness variations observed, but deems inadmissible any opinion testimony from this witness concerning the role of these variations, if any, in causing the flexpipe leaks.

### *Issue F: Fellers' proposed testimony concerning legal duties of Shell and Ticona*

Brookshire seeks to offer expert testimony from Fellers concerning the duties of both Shell and Ticona to ensure the quality of the finished flexpipe which contained Carilon and Fortron, respectively. Concerning Carilon, Fellers opines that Shell, its manufacturer, had a duty to ensure that "...the performance of the final product would in fact be suited to the application as a condition for them to continue to supply material."[34]

Brookshire opposes the exclusion of this evidence and argues that evidence in the record establishes that Shell participated in the "design, manufacture, sale or installation" of the finished product.[35] Under Texas and Louisiana law, Brookshire asserts, Shell did have a duty to ensure that Carilon was fit for use as an inner liner of flexpipe in the Enviroflex system.

The court finds that Fellers possesses no expertise in this area and that he admits that he has no basis for his assertions about Shell's duty under the law.

---

[33]Fellers Deposition of 5/22/06, at pp. 241 - 42.

[34]Id at p. 35.

[35]R. 1098 at p. 8, citing R. 1041 at p. 35.

13

> "Q: And is it within your particular area of expertise to testify regarding that particular level of duty for resin manufacturers in the United States?
>
> A: No."[36]

We will not permit Fellers to offer expert testimony concerning what duties resin manufacturers in the United States owe to consumers of finished products made with their raw materials. This testimony is certainly beyond the scope of Fellers' expertise and lacks reliability.

Fellers' Ticona Report presented the conclusion that Ticona should have built an "experimental gas station" using the Enviroflex system in order to determine whether the TCI fuel delivery system would "perform as intended."[37] Ticona asserts that this testimony is inadmissible because Fellers own testimony confirms that he had no basis for this opinion and that it was outside the scope of his expertise. Brookshire disagrees, but has conceded that it will not seek to offer this testimony at trial.[38] Therefore, Ticona's motion to exclude expert testimony by Fellers that Ticona should have built an experimental gas station will be denied as moot. We find, however, that Fellers should not be permitted, as above, to offer any testimony concerning the legal duty of Ticona with respect to consumers of finished products, as his testimony reveals that this testimony lacks reliability and is inadmissible under the Federal Rules of Evidence and Daubert.

***Issue G: Proposed Testimony by Fellers which summarizes Shell's internal documents***

Throughout his testimony, whether by deposition, report or affidavit, Fellers relies

---

[36]Fellers Deposition of 5/22/06, at p. 41.

[37]Benson Deposition of 5/23/06, attached as "Exhibit 3" to Ticona motion, at p. 107.

[38]R. 1098 at p. 4.

14

heavily on internal documents from Shell as a basis for his conclusions with respect to Carilon and its role in the leaks at issue in this case.

This court has already examined those documents and, as Brookshire points out, found them to be competent summary judgment evidence.[39] Defendants assert, however, that Fellers has used the information in these documents as a substitute for scientific testing. The court agrees.

While the court finds that internal documents generated by Shell concerning Carilon are, indeed, competent summary judgment evidence, we cannot allow purported expert testimony which is, in reality, only a paraphrased rendition of those documents. Fellers conducted no testing or analysis in order to determine veracity of his causation opinions and, admittedly, began his limited testing with the assumption that Carilon leaked and cites internal documents from Shell as proof of this fact.[40] It is undisputed that those documents exist and, as such, those documents themselves are the best evidence of what information they contain. As we have discussed above, Fellers' testimony shall be limited only to the results of those tests which he performed.

### *Issue H*: *Benson's proposed testimony concerning Carilon and Fortron*

Dr. Benson is a colleague of Dr. Fellers and participated in the testing and analysis of the hose samples containing Carilon and Fortron. Specifically, he performed the Fourier Transform Infrared Spectroscopy ("FTIR") and Soxhlet extraction testing.[41] Cleveland's motion seeks to

---

[39] See R. 740.

[40] Fellers Deposition of 5/22/06, at pp. 93 - 94.

[41] Benson Deposition of 5/23/06, at pp. 13 - 16.

15

exclude any expert testimony by Benson which reaches beyond these two tests.

Brookshire responds to Cleveland only by stating that it has no intention of eliciting expert testimony from Benson which reaches beyond the "work he has done to support Fellers' opinions."[42]

Having reviewed Benson's deposition testimony, we find that Benson is qualified to render expert opinions only on those test he performed, as the scope of his involvement with the testing and overall analysis of the hose samples was remarkably limited. By his own admission, Benson has no opinions to offer as to the interpretation of the raw data created by his FTIR and Soxhlet testing.[43] Given Benson's limited involvement with this project, we find that expert testimony by this witness which reaches beyond the FTIR and Soxhlet testing is inadmissible as it lacks reliability.

Ticona's motion alleges that Benson's testimony as to Fortron is also inadmissible for several reasons. First, Ticona points out that Benson is not designated as an expert witness for trial purposes in Brookshire's Rule 26 disclosures. Brookshire does not dispute this argument, but argues, contrary to the assertions of Ticona, that Benson is the co-author of the Carilon and Fortron Reports. While we caution Brookshire about this practice in the future, we find, in this instance, no undue burden or unfair surprise resulted from this unfortunate omission. Defendants were able to depose Benson on more than one occasion and have appropriate notice of the testimony he may properly offer at trial. We decline, therefore, to prevent his testimony as a whole based on Brookshire's omission.

---

[42] R. 1098 at p. 4.

[43] Benson Deposition of 5/23/06, at p. 15.

16

Ticona also alleges that Benson's proposed testimony concerning Fortron should be excluded because it is unsupported by his testing and, therefore, unreliable. We reiterate that we find Benson well-qualified to render expert opinion testimony on the subject of the two tests he performed, but given his admitted lack of interpretive knowledge, he will not be permitted to testify as to issues of causation in this case, as such conclusions would necessarily reach beyond the scope of his stated expertise in this matter.

### *Fellers' proposed testimony concerning pipe elongation*

Ticona asserts, in its motion to exclude certain testimony of Fellers, that his proposed expert testimony concerning the elongation of flexpipe containing Fortron should be excluded because this opinion was not disclosed in his report pursuant to Rule 26(a)(2)(B). Brookshire refutes this argument, pointing out that Fellers' proposed testimony on the characteristics of Lotador and Fortron should be admissible because we have previously reviewed similar testimony from employees of Pump Masters, Inc. and found such evidence to create a material fact issue as to defects in the Fortron-lined flexpipe.

We examine this issue in order to determine whether or not the neglect apparent on Brookshire's part prejudices defendants in any way. We find that it does not, as this supposed "new theory" is, as Brookshire points out, not new at all. We find, however, that Fellers should only be allowed to provide testimony on the characteristics of the polymers indicated: Fortron and Lotador and, as above, shall offer no opinion testimony concerning causation of the leaks in this case, as that issue lies beyond the scope of the tests performed, as well as his expertise. Brookshire is, again, cautioned that the requirements of Rule 26 are an important observance. Failure, in the future, to comply with Rule 26 will demonstrate inexcusable neglect and will not

17

be tolerated.

### *Sanctions*

Brookshire's responses to each of the Daubert motions considered herein incorporates a request for sanctions against those defendants who filed them. Brookshire relies on instructions given by the court in a telephone conference as a basis for its requests. The motions filed as to Benson and Fellers, asserts Brookshire, are not proper Daubert challenges, arguing more about the weight to be given certain evidence than anything else. The court disagrees.

Our review of the motions at hand reveals an appropriate use of the Daubert challenge. Defendants properly contest the reliability of the proposed testimony, at times also pointing out relevancy concerns. In cautioning the parties as to their use of Daubert motions, the court's intent was to prevent frivolity and abuse of this particular type of motion practice. As is evident in our ruling, we find merit in the motions at hand and, accordingly, decline to impose sanctions. Brookshire's motions for sanctions shall be denied.

### III. Conclusion

The court finds that Benson and Fellers are each qualified to render expert opinion testimony concerning the limited testing they performed at Brookshire's request. We do not find, however, that either Fellers, or Benson performed such testing as would make any opinions concerning ultimate causation in this case reliable or relevant as required by Fed. R. Evid. 702 and Daubert. With respect to Fellers, his conclusions as to causation appear to be heavily influenced by the documents he reviewed. This influence created, the court finds, an "analytical gap" between the results actually observed by Fellers and his findings. This gap between testing and result certainly undermines the reliability of the opinions contained in both his report and

proposed testimony.

The court also finds that simple mistakes operated to reduce the relevancy and reliability of both experts' tests. Both Fellers and Benson performed testing on the same group of hose samples. Through a mistake in selecting these samples, no leaking Fortron hose samples were selected for testing. Therefore, no comparative testing between new and used Fortron-lined flexpipe was performed. This lack of testing renders opinions as to causation of certain leaks by these expert witnesses highly speculative. In other cases, tests which were known to exist and to be an appropriate method for discerning certain causes of leaks were simply not performed, perhaps at the direction of Brookshire or, perhaps, by some oversight. In any case, the result is another analytical gap, which cannot be filled by the undue influence of Shell or Ticona's internal documents.

The proposed testimony by both Benson and Fellers will, accordingly, be limited as provided in the order issuing from the court this day. Defendants' motions are hereby granted in those respects. Ticona's motion to exclude Benson's proposed testimony on the basis that he was not disclosed in Brookshire's Rule 26 report will be, for the reasons discussed above, denied. Ticona's motion to exclude Fellers' proposed testimony concerning its duty to build an experimental gas station is denied as moot, considering the agreement of the parties not to seek introduction of this particular opinion at trial.

Alexandria, Louisiana
August 30, 2007

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE