U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - LAKE CHARLES

SEP - 5 2007

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| BROOKSHIRE BROTHERS HOLDING, INC., ET AL | : | DOCKET NO. 04-1150 |
| VS. | : | JUDGE TRIMBLE |
| TOTAL CONTAINMENT, INC, ET AL | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING AND ORDER

Before the Court is "Defendants' Motion to Exclude and/or Limit Certain Opinions and/or Testimony of Plaintiffs' Environmental Expert, Mark Moore" (doc. #1164) filed by defendants, Cleveland Tubing, Inc., Shell Chemical LP, Dayco Products, LLC, Mark IV Industries, Ltd, Ticona Polymers, Inc., Underwriters Laboratories, Inc. and Commerce & Industry Insurance Company.[1] Movers' motion seeks to exclude certain testimony of Plaintiffs' expert, Mark Moore, specifically, that "the number of repair events for the TCI primary gasoline hoses within the Brookshire secondary containment systems are "correlated" to the existence and extent of alleged environmental contamination at the Brookshire stations."[2]

Mr. Moore was retained by Brookshire Brothers to assess the potential environmental contamination at the 68 gasoline stations at issue in this lawsuit. In his supplemental report dated March 14, 2007, Mr. Moore expressed the following opinion:

> Therefore, there is a correlation to the number of product piping/secondary containment repairs and the environmental impairments at the Brookshire Brothers sites: the more product piping/secondary containment repairs, the higher the likelihood of

---

[1] Commerce & Industry was dismissed with prejudice from the suit on July 18, 2007. See doc. #1193.

[2] Defendants' memorandum, p. 3.

environmental impairment, thus indicating that the environmental impairment was *more than likely* a result of the failure of the piping/secondary containment at the sites.[3]

Defendants complain that Mr. Moore is not a statistician and thus is not qualified to render an expert opinion in statistics. Brookshire Brothers concedes that Mr. Moore is not a statistician and agrees that he will not attempt to testify at trial that a statistical correlation exists between leaks from primary flexpipe and pollution. However, Brookshire Brothers asserts that Mr. Moore should be permitted to refer, in his testimony, to the number of leaks from primary flexpipe which have occurred, to support his opinion that those leaks are the source of the gasoline which has contaminated Brookshire Brothers' property.

Mr. Moore also expresses the following opinion regarding causation:

> The petroleum contamination encountered at the sites should *generally* be considered a result of the failure and/or repeated failures of the product piping/secondary containment. . . .[4]

Defendants complain that Mr. Moore's opinion is not supported by any credible evidence or analysis to support this opinion. Specifically, Defendants complain that Mr. Moore (1) did not do the analysis to support such a causation theory, (2) does not have the expertise to opine on several of the critical issues, and (3) completely ignored evidence of alternate sources of the environmental contamination. For instance, Defendants argues that Mr. Moore acknowledged during his deposition that he did not do any scientifically rigorous analysis to assess the relative importance of other potential sources for the measured environmental contamination on the Brookshire Brothers sites, and he lacked the expertise to do fundamental parts of this analysis.[5] Defendants complain that Mr. Moore's causation

---

[3] Defendants' Exhibit A, Moore Supplemental Report at 4.

[4] Defendants' Exhibit B, Moore Supplemental Letter Report at 1.

[5] See Moore Depo. dated April 10, 2007, pp. 280-82.

theory was based on site assessments of the Brookshire Brothers' Texas stores and a review of the hose repair data. However, Mr. Moore conducted no due diligence on the hose repair data to determine if gasoline leaked as a result of the repair, how much gasoline may have leaked and what the final disposition of that gasoline was. He conducted no analysis regarding where and to what extent Brookshire Brothers' secondary containment systems may have leaked and no analysis for alternate spills or environmental contamination sources.

Brookshire Brothers submits the following rebuttal: Jones Environmental, Inc., under the direction of Mr. Moore performed investigation activities which included sampling at approximately 60 Brookshire Brothers stations and consisted of 5 to 8 soil borings and the collection of up to three shallow groundwater samples from temporary wells that were installed in the boreholes. Mr. Moore then extrapolated from the results of the laboratory testing of the samples that were polluted with gasoline to estimate the location and extent of the horizontal location of the pollution and the vertical depth of the contamination. Mr. Moore relied upon information from Brookshire Brothers establishing that the underground storage tanks (with one exception) did not leak, but that the primary flexpipe leaked many times and almost all of the contamination was located, horizontally, close to the primary pipe/secondary containment and was located vertically, at the depth below the surface of the ground where the piping is installed. Brookshire Brothers suggests that all of these facts are consistent with leakage from primary pipe/secondary containment into the environment. Hence, Mr. Moore opines in his report that it is reasonable to conclude that it is more likely than not that the cause in fact of substantially all of the pollution at Brookshire Brothers' stations was leakage of gasoline from primary flexpipe which escaped from the secondary containment system.

Defendants' have a valid concern that Mr. Moore's report completely ignore other sources of contamination. However, Mr. Moore testified that because of the design of TCI's Enviroflex system,

he would expect leaks from primary pipe/secondary containment to be located horizontally, around the secondary containment pipe, and vertically, below the surface of the ground, at the level where secondary containment pipe is installed. Mr. Moore then tested soil and groundwater in specific locations to make a determination as to the source of the leaks. Thus, Mr. Moore's conclusion, whether right or wrong, is based on a scientific methodology. At trial, Defendants will be given ample opportunity to cross-exam Mr. Moore as to any alleged discrepancies in opinion and will also be permitted to submit their own expert witness to rebut and/or challenge the credibility of Mr. Moore's conclusions.

## ORDER

Based on the foregoing, the motion to exclude the testimony of Mr. Mark Moore (doc. #1164) is hereby **GRANTED** in part and **DENIED** in part. The motion is **GRANTED** to the extent that Mr. Moore shall not be allowed to testify as to the following:

> There is a correlation to the number of product piping/secondary containment repairs and the environmental impairments at the Brookshire Brothers sites: the more product piping/secondary containment repairs, the higher the likelihood of environmental impairment, thus indicating that the environmental impairment was *more than likely* a result of the failure of the piping/secondary containment at the sites.

Otherwise, the motion is **DENIED**.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 5th day of September, 2007.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE